## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:14-cv-23193-UU

QUANTUM CAPITAL, LLC,

     Plaintiff,

v.

BANCO DE LOS TRABAJADORES, *et al.*,

     Defendants.

_____/

## OMNIBUS ORDER

THIS CAUSE is before the Court upon Defendants' Motion for Summary Judgment, D.E. 157, Plaintiff's Motion for Partial Summary Judgment, D.E. 160, and Plaintiff's Motion for Sanctions, D.E. 138. These Motions are now fully briefed and ripe for disposition.

**I.      Motions for Summary Judgment**

## BACKGROUND

The facts as recited below are undisputed, unless otherwise noted.

Defendant Banco de los Trabajadores ("Bantrab") is the fifth largest bank in Guatemala and is a Guatemalan entity. D.E. 160-1 ¶ 1. During all relevant times, individual Defendant Sergio Hernandez was a primary director on, and the President of, Bantrab's Board of Directors, D.E. 172 at 6, ¶ 6, and individual Defendant Eduardo Liu was a primary director on Bantrab's Board of Directors, D.E. 172 at 7, ¶ 7. Individual Defendant Ronald Garcia has been Bantrab's General Manager since 2005 and continues to serve in that role. *Id.* ¶ 8. Garcia became a primary director on Bantrab's Board of Directors in 2010 and continues to serve in that role as well. *Id.*

Plaintiff Quantum Capital LLC ("Quantum") is a Florida limited liability company operating from and with its principal place of business in Florida. D.E. 176 ¶ 6. Oswaldo Jugo ("Jugo") is the corporate representative, owner, and sole member of Quantum. D.E. 172 at 6, ¶ 3; D.E. 196 ¶ 1. Quantum was created on or about August 2006. D.E. 196 ¶ 2. As well as being the owner of Quantum, Jugo has been associated with and employed at a number of other companies that have entered into contracts with Bantrab regarding the debt financing and equity issuance that are at issue in this case. D.E. 172 at 7, ¶¶ 9, 10; D.E. 196 ¶ 2.

### Debt Issuance

Bantrab first entered into a contract with a Jugo-related entity named New Continent Finance, Inc. ("NCF") on March 19, 2007, for the purpose of issuing debt and raising equity. D.E. 172 at 7, ¶ 13. Jugo opened NCF in approximately 2001 with a partner, Gustavo Rosas, and they each owned 50% of the company at the time. D.E. 196 ¶¶ 3, 4. Jugo has since left NCF, though it remains a viable company with three owners. *Id.* ¶ 5.

The contract between NCF and Bantrab required NCF to look for and introduce Bantrab to financial institutions or persons that could be interested in a transaction that would involve Bantrab. D.E. 196 ¶ 10. In exchange, Bantrab was to pay NCF a success fee of 1.25% of total debt raised and separately pay a success fee of 4% of total equity raised. D.E. 172 at 7, ¶ 13. After executing the contract, Bantrab paid NCF the retainer amounts required in the contract. *Id.* ¶ 14.

While associated with NCF, Jugo introduced Bantrab to Deutsche Bank in connection with a contemplated debt issuance in the international markets. *Id.* ¶ 16; D.E. 196 ¶ 11. In 2007 and 2008, Jugo worked with Bantrab's lawyers handling the Deutsche Bank transaction, and

2

Jugo had extensive involvement with the preparation of a 2008 Private Placement Memorandum. D.E. 176 ¶ 16.

On or about June 27, 2008, Bantrab entered into a second contract with Activa Capital Group, Inc. ("Activa"). D.E. 196 ¶ 9; D.E. 172 at p. 8, ¶ 15. Activa was another company created by Jugo that he co-owned with a partner named Franco Castro. D.E. 196 ¶¶ 16, 17. Under the Activa contract, Activa was engaged by Bantrab to act as an exclusive financial advisor in connection with the structuring and arrangement of debt financing and equity investment. D.E. 157-5. In exchange for these services, just like its contract with NCF, Bantrab was to pay Activa a success fee of 1.25% of total debt raised and separately pay Activa a success fee of 4% of total equity raised. D.E. 172 at 8, ¶ 15.

On October 7, 2008, Jugo provided Bantrab with yet another contract for debt financing services to be provided by a different entity, United Capital Service, Inc. ("UCS"). D.E. 157-6. Bantrab and UCS did not enter into this agreement and neither party signed the contract. *Id.*

In 2009, Deutsche Bank decided to postpone the debt financing transaction until the market stabilized after the financial collapse. D.E. 179-1 at ¶ B.2.

On July 25, 2011, Bantrab executed a contract with Quantum for Quantum to act as a financial advisor to Bantrab in "connection with the structuring and arrangement of [a] debt financing." D.E. 157-4. Specifically, Quantum agreed to "undertake the following tasks, among others:

    a.   Familiarize itself to the extent it deems appropriate and feasible with the business, operations, properties, condition (financial and otherwise) and prospects of BANTRAB and the Transaction;

    b.   Seek to introduce BANTRAB to other Institutions, Companies and/or Persons (the "Investors") who might be interested in a Transaction involving BANTRAB;

    c.   Assist BANTRAB as to strategy and tactics in connection with its negotiations of the proposed Transaction(s) and; if requested, participate in such negotiations;

    d.   Assist BANTRAB in negotiating the financial aspects of definitive agreement(s);

    e.   Advise and assist BANTRAB with respect to the form and structure of the proposed Transaction(s);

    f.   Render such other financial advisory services as may from time to time be agreed upon by QUANTUM and BANTRAB[.]"

*Id.* In exchange, Bantrab was to pay Quantum a success fee of 1.5% of the total debt raised under the engagement. *Id.*

Although the written agreement between Quantum and Bantrab is dated July 25, 2011, Quantum maintains, and Bantrab disputes, that Quantum began providing services to Bantrab in 2009 for both debt and equity transactions, albeit with no written contract.

In February 2013, Deutsche Bank contacted Bantrab to discuss resuming the placement of Bantrab bonds in the international market. D.E. 179-1 ¶ B.8. Ultimately, in November 2013, Bantrab and Deutsche Bank AG, London Branch, entered into a Senior Unsecured Loan Agreement for $150 million. D.E. 160-1 ¶ 4. Bantrab did not pay Quantum or any other entity, including NCF and Activa, a success fee relating to the debt financing.

The parties fiercely dispute whether Quantum performed the services it agreed to undertake in the July 25, 2011 contract for the 2013 Deutsche Bank transaction which would entitle it to payment. The following facts related to Jugo's involvement with the 2013 debt financing are not disputed:

- Jugo did not see the 2013 Private Placement Memorandum ("PPM") related to the Deutsche Bank transaction before it went out on the market. D.E. 196 ¶ 30.

- Jugo provided no comments and did not have any involvement in drafting the PPM. *Id.* ¶ 31.

- Jugo does not know when Deutsche Bank met with Bantrab in 2013 nor who participated in any meetings. *Id.* ¶ 32.

- Jugo did not attend any meetings between Deutsche Bank and Bantrab in 2013. *Id.* ¶ 34.

- Jugo did not send any emails in 2013 to anyone at Deutsche Bank concerning the debt issuance. *Id.* ¶ 35.

- Jugo admitted that Bantrab did not conceal the debt issuance or preclude him from participating in the transaction. *Id.* ¶ 38.

- Jugo admitted that Deutsche Bank had been introduced to Bantrab in 2007 when Jugo was with NCF. *Id.* ¶ 39.

- Quantum did not assist Bantrab with respect to the form and structure of the proposed transaction with Deutsche Bank in 2013. *Id.* ¶ 42.

Quantum contends, and Bantrab disputes, that it "worked on transactions concerning debt and capital from 2011 through 2013, and was in continuous and persistent contact with Bantrab, the individual Defendants, Bantrab employees, and Deutsche Bank." D.E. 179-1 ¶ B.4. "Throughout 2012, Quantum regularly corresponded with Mr. Gabriel Roitman (Deutsche Bank's Managing Director and Head of Latin America Investment Banking) and Deutsche Bank about Bantrab, the Deutsche Bank transaction, the DHK (capital) transaction, and business opportunities in Guatemala and elsewhere." *Id.* ¶ B.5. In support of these statements, Quantum cites to Jugo's deposition testimony and emails between Jugo and Gabriel Roitman of Deutsche Bank. D.E. 181-5.

In Quantum's Amended Complaint, it alleges the following Counts against Bantrab related to these facts: (I) that Bantrab breached its July 25, 2011 contract with Quantum by failing to pay Quantum the 1.5% success fee for the successful issuance of $150 million in international bonds; (II) that Bantrab was unjustly enriched by Quantum introducing Bantrab to Deutsche Bank as a partner and aiding in the issuance of $150 million; and (III) a claim for promissory estoppel alleging that Bantrab promised Quantum it would compensate Quantum for the work provided for the debt issuance and Quantum justifiably relied on that promise and conferred a benefit on Bantrab for which it has not been compensated.

### *Raising Equity*

5

Separately, Bantrab began pursuing a capital infusion apart from the debt issuance because it needed a better capitalization ratio before the debt legally could be issued. Jugo testified that Quantum began working on the capitalization in 2008. D.E. 181-4 at 120:8-13. Ultimately, DHK Finance invested $20 million in Bantrab in exchange for preferred shares. D.E. 179-1 ¶ B.19. The parties dispute whether Quantum had an oral contract with Bantrab to provide services for the capitalization, and whether Quantum performed any work for Bantrab regarding the DHK Finance transaction.

<u>Oral Contract</u>

Quantum did not have a written contract with Bantrab to work on the capitalization. D.E. 196 ¶ 68. However, Quantum contends that it had an oral agreement with Bantrab as early as 2011 to act as a financial advisor for the capital infusion. D.E. 179-1 ¶ B.16; D.E. 181-4 at 190:11-18. In exchange, Bantrab would pay Quantum a 5% success fee of any equity raised. *Id.* Quantum contends that Bantrab, through the individual Defendants, repeatedly represented that this agreement was in place despite not having a written contract. D.E. 179-1 ¶¶ B.21-B.25. In support thereof, Quantum submits an email from Defendant Liu to Jugo in which he says "not to worry about the capital contract." D.E. 182-4. Quantum also submits declarations from Hidalgo Socorro, the president of DHK Finance, and Braulio Perez, the director of DHK Finance, in which they state that Defendant Sergio Hernandez confirmed at three separate meetings that Quantum, through Jugo, would be paid a 5% success fee. D.E. 183-1; D.E. 183-2. These meetings and representations occurred in May, 2012. *Id.* Further, Mr. Perez represents that Defendant Garcia told him in a separate telephone call that a check for Jugo was ready to be picked up. D.E. 183-2 ¶ 12.

Bantrab disputes that it had an oral agreement with Quantum for the capitalization and instead asserts that there was an agreement that Jugo, not Quantum, would be paid a 5% success fee. D.E. 191 ¶ 21. Bantrab further contends that during the relevant time period, it had entered into written contracts with entities other than Quantum for financial advising services related to the capitalization. *Id.*

Bantrab asserts that it first entered into a contract with United Financial Services, LLC ("UFS") for capital infusion at approximately the same time it entered into the written agreement with Quantum related to the debt infusion. D.E. 196 ¶¶ 22, 23. On July 22, 2011, Jugo emailed both the Quantum debt issuance contract and the UFS capital infusion contract to Bantrab. D.E. 157-14. Jugo testified that he proposed a contract between Bantrab and UFS for the capital infusion because Bantrab had requested that the capital infusion contract be separate from the debt issuance contract. D.E. 181-4 at 195:3-197:10. Jugo testified, however, that the UFS contract was never signed by the parties. *Id.* at 198:9-15. Jugo has never owned any interest in UFS, rather, he had an agreement with the owner that UFS would compensate him for a negotiated fee. D.E. 196 ¶¶ 24, 25.

Bantrab subsequently entered into two contracts with Exotix Partners LLP ("Exotix"), an investment bank introduced to Bantrab by Quantum. D.E. 196 ¶¶ 55, 57. Bantrab first executed an Advisory Service Agreement on December 9, 2011, and then executed a second agreement on June 26, 2012. *Id.* ¶ 57; D.E. 157-9; D.E. 157-8. Jugo has never had an ownership interest in Exotix. D.E. 172 at 8, ¶ 20. In the June 26, 2012 agreement, Exotix was named the exclusive arranger/placement agent for the equity transaction, and the parties "envisage[d] that the capital raised within the framework of the Financing shall amount to approximately USD 20 million."

D.E. 157-9 at 3.[1] Under the June 26, 2012 contract, Bantrab agreed to pay Exotix a 1.5%

structuring fee of the total aggregate amount of the financing, and a 5% placement fee upon

closing of the financing. D.E. 157-9.

The parties also do not dispute that separately, prior to the June 26 contract with Bantrab,

Exotix entered into an Introductory Brokerage Agreement on January 30, 2012 with Activa

whereby Activa would receive 80% of the fees received by Exotix for investors brought to it by

Activa. D.E. 196 ¶ 59; D.E. 157-10. Jugo testified that he entered into the brokerage agreement

on behalf of Activa because he was "pushing the Activa brand" at the time. D.E. 196 ¶ 59.

Around March 18, 2013, Jugo got into a disagreement over his commission with Exotix.

D.E. 157-15; D.E. 181-4 at 226:9-229:13. On March 14, 2013, Jugo advised Bantrab to terminate

its agreement with Exotix and drafted the termination letter to be executed by Defendant Garcia.

D.E. 196 ¶ 64. The termination letter was executed and sent by Garcia to Exotix on March 14,

2013. *Id.* ¶ 65. Jugo sent a written contract to Defendant Garcia on March 11, 2013 for Bantrab

to sign that stated Quantum would work on the capitalization, but Bantrab did not sign that

contract. D.E. 179-1 ¶ B.28; D.E. 182-3. The parties agree that Defendant Garcia had told Jugo

that Bantrab would potentially pay Quantum the 1.5% success fee in the July 25, 2011 contract,

instead of the 5% Quantum contends Bantrab agreed to pay, in connection with the DHK

closing. D.E. 179-1 ¶ 30; D.E. 182-5 at 148:19-25.

<u>Quantum's Role in the Capitalization</u>

The parties do not dispute that Quantum prepared an indicative term sheet for the DHK

transaction that DHK Finance executed and presented to Bantrab on April 9, 2013. D.E. 196

---

[1] The June 26, 2012 Exotix agreement submitted to the Court has not been signed by Bantrab. However, because Quantum does not dispute that Bantrab did execute this agreement, this fact is deemed admitted.

¶ 66. Beyond that, the parties again strongly contest whether Quantum worked on the DHK transaction such that Quantum would be entitled to payment under any oral agreement. Quantum contends it introduced Bantrab to DHK and its president, Hidalgo Socorro. D.E. 179-1 ¶ B.18. Defendants argue that this introduction occurred through Activa because that was the "brand" Jugo was pushing at the time. D.E. 191 ¶ 18. The parties agree that Quantum prepared an indicative term sheet for DHK, which DHK executed and presented to Bantrab on April 9, 2013. D.E. 196 ¶ 66.

The parties do not dispute that the DHK transaction closed on June 4, 2013 and that the transaction involved the sale of $20 million in preferred equity in the form of stock in Bantrab. D.E. 196 ¶¶ 67, 74. Bantrab has not paid Quantum, or any other entity, a 5% success fee relating to the $20 million DHK transaction. D.E. 172 at 9, ¶ 27.

Based on the facts surrounding the DHK capital infusion transaction, Quantum brought the following three counts against Bantrab: (IV) Bantrab breached its oral agreement with Quantum to pay Quantum 5% of the total amount of the preferred equity purchase agreement in exchange for Quantum introducing a qualified investor to Bantrab; (V) that Bantrab was unjustly enriched by Quantum securing DHK Finance as an investor and aiding in the execution of the purchase of $20 million in Bantrab preferred equity; and (VI) a claim for promissory estoppel alleging that Bantrab promised Quantum it would compensate Quantum for the work provided for the capitalization and Quantum justifiably relied on that promise and conferred a benefit on Bantrab for which it has not been compensated

### *Fraud in the Inducement*

Count VII of Quantum's Amended Complaint is a claim for fraud in the inducement brought against the individual Defendants. This claim alleges that the individual Defendants

would personally benefit from the preferred equity transaction based on the terms included in a written agreement titled "Acuerdo de Entendimiento" ("*Acuerdo*"). D.E. 40 ¶ 70. Therefore, the Defendants were motivated to induce Quantum to continue to work on both the capitalization and the debt issuance. *Id.* ¶ 72. The Defendants allegedly made a number of material misrepresentations to induce Quantum to continue working on these transactions, including representing that Bantrab would pay a 5% success fee to Quantum for the total amount of the equity issued, but that the Defendants had no intention of paying the fee at the time the representations were made. *Id.* ¶¶ 74-80. Quantum also alleges that when Garcia signed the July 25, 2011 written contract, he had no intent of paying Quantum the 1.5% fee reflected in the written contract relating to the debt issuance. *Id.* ¶ 81.

Quantum's position is clearly that it began working on the debt issuance and capitalization in 2008. D.E. 196 ¶ 46. Thus, Quantum agrees that at the time the *Acuerdo* was signed, Quantum had been working on the debt issuance and capitalization for approximately four years. *Id.* ¶ 50. Further, Quantum agrees that it did not start working on the debt and equity transactions due to the *Acuerdo* and that Quantum did not begin to work on the capitalization based on the statements alleged in the Amended Complaint. *Id.* ¶¶ 51, 54.

### *Illegality*

Defendants raise an affirmative defense that both of the alleged contracts are illegal because the transactions at issue involved the purchase sale, and exchange of securities, and Quantum is not registered as a securities broker, which is illegal under both the Securities and Exchange Act of 1933, 15 U.S.C. 78o(a)(1) and Florida Statute 517.12(1). Because, Defendants contend, the contracts are illegal, they are void and unenforceable. There is no dispute that

Quantum has never held any SEC or FINRA license for the sale of securities, nor does it have

any type of broker's license under Florida or federal law. D.E. 196 ¶¶ 69, 71.

## LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of

demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. When

determining whether the moving party has met this burden, the Court must view the evidence

and all factual inferences in the light most favorable to the non-moving party. *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir.

2002).

The party opposing the motion may not simply rest upon mere allegations or denials of

the pleadings; after the moving party has met its burden of proving that no genuine issue of

material fact exists, the non-moving party must make a showing sufficient to establish the

existence of an essential element of that party's case and on which that party will bear the burden

of proof at trial. *See Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club of*

*Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933

(11th Cir. 1989).

If the record presents factual issues, the Court must not decide them; it must deny the

motion and proceed to trial.  *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

Summary judgment may be inappropriate even where the parties agree on the basic facts, but

disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec.*

*Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might

differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## DISCUSSION

Defendants move for summary judgment on every count in Quantum's Amended Complaint. Defendants also move for summary judgment on its first affirmative defense with respect to Counts IV through VII. Quantum cross-moves for summary judgment on Defendants' first affirmative defense. The Court addresses each argument in turn.

### A.     *Count I*

Defendants move for summary judgment on Count I of Quantum's Amended Complaint because, they contend, there is no issue of fact that Quantum has not satisfied the conditions precedent under the July 25, 2011 contract that would entitle it to payment. Specifically, Defendants argue that Quantum did not perform under the contract because it did not introduce

Bantrab to Deutsche Bank, nor did it perform any financial advisory services related to the 2013 Deutsche Bank transaction. Instead, Jugo acted on behalf of NCF between 2007 and 2008 when he introduced Deutsche Bank to Bantrab and facilitated the debt issuance during that time period by being involved with Bantrab's lawyers handling the Deutsche Bank transaction. D.E. 196 ¶ 28. According to Defendants, after the 2008 transaction was halted by Deutsche Bank, Jugo performed no work on the debt issuance, and performed no work on behalf of Quantum after the 2011 contract was executed.

Quantum responds that there is a genuine dispute of material fact based on record evidence as to whether Quantum substantially performed under the contract, or was excused from performance, such that it is entitled to payment. Quantum relies on testimony from Jugo and emails between Liu, Jugo, and Garcia, to contend that it began working on the Deutsche Bank transaction as early as February 2009, and that Bantrab was aware of this work. *See* D.E. 179-1 ¶ B.1. Quantum asserts that it continued to work on the debt issuance after executing the July 25, 2011 contract with Bantrab by keeping "constant contact with Deutsche Bank about the Deutsche Bank transaction, attend[ing] meetings with bank managers and directors, work[ing] with the rating agencies and local lawyers as well [as] the auditors." D.E. 179 at 3. Quantum also argues that working on the capitalization transaction was necessary for the debt issuance to go through, and therefore any work completed for the capital issuance would entitle Quantum to payment under the July 25, 2011 contract.

Neither party cites any legal support for their position. Under Florida law, a breach of contract claim requires Quantum to prove the following by a preponderance of the evidence: (1) a valid contract; (2) a breach thereof; and (3) damages flowing from the breach. *Handi-Van, Inc. v. Broward Cty.*, 116 So. 3d 530, 541 (Fla Dist. Ct. App. 2013).

The question before the Court is whether Quantum has performed its duties under the July 25, 2011 contract such that it is entitled to compensation. "In Florida, a party's adherence to contractual conditions precedent is evaluated for substantial compliance or substantial performance." *Green Tree Servicing, LLC v. Milam*, 177 So. 3d 7 (Fla. Dist. Ct. App. July 29, 2015). "Substantial compliance or performance is that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the other party the benefit of the bargain." *Id.* (internal quotations and citations omitted). "The question of whether there has been substantial performance, however, is normally a question of fact for the trier of fact to resolve based on all of the relevant evidence." *Nat'l Constructors, Inc. v. Ellenberg*, 681 So. 2d 791, 794 (Fla. Dist. Ct. App. 1996).

Here, the contract called for Quantum to undertake certain tasks as a condition precedent to being compensated by Bantrab. D.E. 40-1 ¶ 1. Whether or not Quantum substantially performed those services or was excused from performance such that it is entitled to compensation is a question of fact that should go to the jury. Quantum has provided sufficient evidence demonstrating that there is a genuine issue of material fact regarding substantial performance. This evidence includes the following:

- Jugo's testimony that he had a "couple of meetings with Deutsche Bank around 2013 and [he] discussed the bond issuance with Gabriel Roitman." D.E. 181-4 at 70:14-15.

- Jugo's testimony that he spoke with Antonio Navarro, a Deutsche Bank employee, in 2013 concerning the debt issuance with Bantrab, while Jugo was working on the capitalization with DHK. D.E. 181-4 at 71:24-72:6.

- Jugo was copied on the email exchanging the 2013 engagement letter between Deutsche Bank and Bantrab and testified that he had telephone conversations with Benjamin Arriaza regarding the engagement letter. D.E. 182-1; D.E. 181-4 at 79:15-80:1.

- Jugo's testimony that he asked for an executed copy of the engagement letter. D.E. 181-4 at 81:1-12.

14

- Jugo's testimony that he spoke with Jorge Luis Solorsano, a Bantrab employee, regarding the debt issuance while Jugo was working on the capitalization and that Jugo had comments about the debt issuance transaction. D.E. 181-4 at 82:11-83:19.

- Jugo's testimony that he was not involved in the renegotiation of terms in the PPM in the "last mile of the transaction," but that he had participated in conference calls leading up to that point, and that all the 2013 work was a continuation of his efforts that he began in 2007. D.E. 181-4 at 96:5-99:1.

- Jugo's testimony that he was not provided with the 2013 debt issuance documents. D.E. 181-4 at 102:15-104:9.

- Jugo's testimony that he advised Bantrab as to structure and form of the Deutsche Bank transaction in 2011 and 2012. D.E. 181-4 at 106:5-24.

- Emails between Jugo and Gabriel Roitman, a Deutsche Bank employee. D.E. 181-5.

- Emails from the individual Defendants stating capitalization is important for the debt issuance, and needs to happen ASAP. D.E. 183-5.

The Court recognizes that Quantum's evidence has weaknesses. Jugo's testimony regarding whether Quantum worked on the debt issuance, and, if so, the extent of its participation, is far from clear. At times his testimony is that he only contacted Deutsche Bank to further his work on the capitalization. Further, his testimony as to why he was copied on the email transmitting the Deutsche Bank engagement letter is contradicted by Arriaza's testimony that copying Jugo was a mistake. *See* D.E. 182-2 at 167:16-25. However, determining the weight and credibility of these witnesses and sorting through this evidence and testimony is a role for the jury, not the Court. Accordingly, the Court will not enter judgment for Defendants on Count I of Plaintiff's Amended Complaint.

### B. Counts II and III

Defendants contend that judgment should be granted against Quantum for Counts II and III of the Amended Complaint because Quantum cannot pursue equitable causes of action based on the same conduct underlying its breach of contract claim in Count I. Quantum contends that

Defendants' argument is premature because Defendant Garcia testified that the July 25, 2011 contract did not cover the Deutsche Bank transaction that closed in 2013 and there is therefore a question of fact as to whether a valid contract governs this transaction.

"[A] plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists." *Ocean Cmmc'ns, Inc. v. Bubeck*, 956 So. 2d 1222, 1225 (Fla. Dist. Ct. App. 2007). The parties have stipulated to the fact that Bantrab entered into a written contract dated July 25, 2011 with Quantum, D.E. 172 ¶ 18, and it is undisputed that this contract relates to Quantum's services to assist Bantrab's debt financing, D.E. 179-1 ¶ 21. Further, neither party disputes the existence of this contract. Accordingly, Counts II and III are due to be dismissed.

Contrary to Quantum's assertions, Garcia's testimony does not create an issue of fact as to whether the July 25, 2011 contract covers the 2013 Deutsche Bank transaction. Garcia's testimony is that Jugo did not participate in the 2013 debt issuance, but that he had participated in another earlier negotiation with Deutsche Bank involving a debt transaction. D.E. 182-5 at 152:5-153:2. This testimony is not that the 2011 contract covers a "different operation," but instead is that Jugo earlier participated in a "different operation" than contemplated by the 2011 agreement. Because the parties agree that whatever services Quantum provided to Bantrab for the 2013 debt financing are governed by the 2011 written contract, the Court will grant judgment against Plaintiff on Counts II and III of the Amended Complaint.

### C.    *Count IV*

Defendants move for summary judgment on Count IV of Quantum's Amended Complaint, which alleges a breach of contract claim based on the alleged oral agreement to pay Quantum a 5% success fee for its financial advising services in connection with Bantrab's

capitalization with DHK. Defendants contend that there is no evidence of the existence of such a contract because "[i]t is undisputed that BANTRAB made it explicitly clear to Jugo that it did not want to close the DHK or any capitalization transaction with Quantum." D.E. 157 at 12. Further, even if an oral contract was formed, Defendants argue they are entitled to summary judgment because "Quantum did not introduce DHK to Bantrab nor did its actions lead to the consummation of the DHK Transaction in this case." *Id.*

There are plainly genuine issues of material fact as to whether the alleged oral agreement exists, and whether Quantum substantially performed under the oral agreement such that it is entitled to compensation. Accordingly, Defendants' Motion will be denied as to Count IV.

First, the Court notes that the "existence of a contract is a question of fact to be determined by consideration of all the facts and circumstances," and such a question of fact can preclude summary judgment. *Lockheed Martin Corp. v. Galaxis USA, Ltd.*, 222 F. Supp. 2d 1315, 1323 (M.D. Fla. 2002); *Nature's Prods. Inc. v. Natrol, Inc.*, 990 F. Supp. 1307, 1315 n.6 (S.D. Fla. 2013).

Here, Jugo and Samuel Moncada, a financial analyst working with Quantum, both testified repeatedly that Bantrab had an oral agreement with Quantum for Quantum to both provide financial advisory services to Bantrab and to introduce Bantrab to potential investors for the capitalization in exchange for a 5% success fee of all capital raised. D.E. 182-6 at 54:2-55:24; D.E. 181-4 at 190:11-24. Further, in the declarations submitted by Quantum from Socorro and Perez, both state that they witnessed the individual Defendants confirming that an oral agreement between Bantrab and Quantum was in place. D.E. 183-1 ¶¶ 9, 11, 12; D.E. 183-2 ¶ 8. As such, the existence of the oral agreement is a question of fact to be determined by the jury.

Further, there is evidence sufficient to create a genuine issue of material fact that Quantum performed financial services for the capitalization under the alleged oral contract. Jugo testified that Quantum introduced Bantrab to DHK Finance and Socorro. D.E. 181-4 at 153:3-15. Further, Moncado testified about the services Quantum provided to Bantrab for the capitalization, including organizing documents to formalize the capitalization. D.E. 182-6 at 56:9-24. As such, the Court will not grant summary judgment for Defendants on Count IV.

**D.      Counts V and VI**

Defendants move for summary judgment on Counts V and VI because they contend that Quantum did not work on the DHK transaction. Therefore, Quantum would not be entitled to pursue any equitable remedies for services rendered in connection with the capitalization. Because, as detailed above, there is a genuine issue of material fact as to whether Bantrab contracted with Quantum for the services and whether Quantum provided services for the capitalization, summary judgment will not be entered for Defendants on these counts.

**E.      Count VII**

Defendants move for summary judgment on this Count because (1) Quantum has no evidence that the individual Defendants did not have an intent to pay Quantum when they promised payment; (2) any representations made to Jugo while he was working on behalf of non-related entities cannot constitute misrepresentations made to Quantum; and (3) any misrepresentations that were made to Quantum were made after it started working on the capitalization and could not have induced Quantum to work on the capitalization.

In response, Quantum contends that a fraud claim is not appropriately disposed of on summary judgment. Quantum argues that its allegations of fraud involve the intent of the individual Defendants, which require that a factfinder evaluate the credibility of witnesses and

18

other evidentiary matters. Quantum contends that there is circumstantial evidence that the individual Defendants did not intend to perform at the time they promised they would pay Jugo for his work on the debt and equity transactions. This evidence includes: (1) Jugo's testimony that they kept pushing him to close the capitalization deal and stated he should not worry and he would be paid, but they did not sign an agreement to pay Quantum; and (2) that the individual Defendants made numerous representations, including to Hidalgo Socorro, that they would pay Jugo for his work on the capitalization.

In response to Defendants' second argument, Quantum argues that its claim "for fraud begins with Defendants misrepresentations that Quantum would be paid for work relating to the Deutsche Bank and DHK transactions." D.E. 179 at 15. Quantum contends that because there is evidence that the individual Defendants understood Quantum was providing services to Bantrab as of 2009, there is a dispute as to whether Defendants misrepresented in 2009 that Quantum would be paid.

Finally, as to Defendants' third argument, Quantum contends that Defendants misunderstand the allegations in the Amended Complaint. According to Quantum, it does not allege that the *Acuerdo* induced it to working and continuing to work on the capitalization. Rather, the *Acuerdo* is evidence of Defendants' motivation to induce Quantum to continue working on the capitalization, and that Quantum was induced to work and continue working on the capitalization based on the individual Defendants' representations that Bantrab would pay Quantum a 5% success fee for the capitalization and a 1.5% success fee for the debt financing.

"A cause of action for fraud in the inducement contains four elements: (1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to

the party acting in reliance." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 808-09 (11th Cir. 2010) (internal quotations and citations omitted). "[A]s a general rule, fraud cannot be predicated on a mere promise not performed." *Id.* at 809 n.12 (quoting *Alexander/Davis Props., Inc. v. Graham*, 397 So. 2d 699, 706 (Fla. Dist. Ct. App. 1981)). "However, under certain circumstances, a promise may be actionable as fraud where it can be shown that the promissor had a specific intent not to perform the promise at the time the promise was made, and the other elements of fraud are established." *Id.*

Quantum's claim for fraud in the inducement cannot proceed to trial because there is no evidence, direct or circumstantial, that the individual Defendants did not intend to compensate either Jugo or Quantum for their work on the debt and equity transactions at the time Defendants allegedly promised such compensation. Jugo testified at his deposition that the only evidence that the individual Defendants had no intent to pay him or Quantum when they made such representations is that they have not paid him. D.E. 181-4 at 121:21-124:25. The only additional evidence Quantum relies on in opposition to Defendants' Motion is that the individual Defendants represented to Hidalgo Socorro that Quantum would be paid. A subsequent failure to perform a promise is not evidence that a party had no intent to perform the promise when made. *See Alexander/Davis Props.*, 397 So. 2d at 708 (reversing trial court's final judgment finding fraud where there was no evidence "other than the subsequent failure to complete the promise, that the Alexander letter was written with an existing intent not to comply"); *Prieto v. Smook, Inc.*, 97 So. 3d 916, 918 (Fla. Dist. Ct. App. 2012) (reversing trial court judgment finding fraudulent inducement because there was no indication that the appellant "did not intend to pay back the loan at the time he promised to pay"); *Argonaut Dev. Grp., Inc. v. SWH Funding Corp.*, 150 F. Supp. 2d 1357. 1364 (S.D. Fla. 2001) (granting summary judgment on plaintiff's

fraudulent inducement claim because plaintiff produced no evidence of defendant's alleged intent and court would not allow plaintiff to "attempt to provide evidence at trial").

Here, despite Quantum's assertions that "the record is replete with circumstantial evidence establishing Defendants did not intend to cause Bantrab to pay Plaintiff at the time they promised they would," there is no evidence of Defendants' intent except for Bantrab ultimately not paying Quantum. D.E. 179 at 14. This is insufficient evidence to allow this claim to go before the jury and does not establish a genuine issue of material fact as to whether Defendants acted with the specific intent to not pay Quantum when they allegedly promised payment. *See Argonaut Dev. Grp.*, 150 F. Supp. 2d at 1364. Accordingly, the Court will grant summary judgment against Count VII of Plaintiff's Amended Complaint.

### F.    *Defendants' First Affirmative Defense of Illegality*

Defendants move for summary judgment on Counts IV through VII based on their first affirmative defense that the alleged oral agreement for Quantum to assist with the capital infusion is illegal under federal and Florida securities laws.[2] Specifically, because it is undisputed that Quantum is not a licensed or registered securities broker, D.E. 196 ¶¶ 69-71, the contract is illegal because it calls for Quantum to act as a securities broker.

Quantum cross-moves for summary judgment on this defense because, it argues, the transactions in this case fall outside the territorial reach of the federal and Florida securities law

---

[2] Defendants also assert in their Motion that the agreement is illegal under Guatemalan law. This argument, however, fails on its face for a number of reasons. First, Defendants did not raise Guatemalan law as a basis for their illegality defense in their Answer, or in response to Quantum's interrogatories. Second, the argument is plainly deficient on its face as Defendants provide no certified translation of the alleged Guatemalan law, or any cases interpreting this law, that supposedly underpins their argument. Third, the Court has previously stricken Defendants' supposed expert on Guatemalan securities law, and there is therefore no evidence in the record to support this argument

because the transactions occurred between foreign entities and were consummated outside the United States.

       i.     <u>Federal Securities Law</u>

Under Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1):

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

The term broker means "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). Under Section 29(b) of the Exchange Act, "[e]very contract made in violation of any provision of [the Act] . . . and every contract . . . the performance of which involves the violation of . . . any provision of [the Act] . . . shall be void . . . as regards the rights of any person who, in violation of any such provision . . . shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b). This provision allows a party to a brokerage agreement with an unregistered broker to void the contract and bar compensation to the unregistered broker. *Regional Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 564 (5th Cir. 1982). "[A] person can avoid a contract under section 29(b) if he can show that (1) the contract involved a "prohibited transaction," (2) he is in contractual privity with the defendant, and (3) he is "in the class of persons the Act was designed to protect." *Id.* at 559.

In 2010, the Supreme Court held that the Exchange Act only governs conduct "in connection with the purchase or sale of a security listed on an American stock exchange, and the

purchase or sale of any other security in the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010). Thus, the Exchange Act's extraterritorial reach was confined to transactions occurring in the United States. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66-67 (2d Cir. 2012).

Although *Morrison* was decided in a case alleging a Section 10(b) claim for securities fraud, the opinion is broadly worded and has been applied to cases where a party attempts to bring an action against an unregistered broker under Section 15(a) of the Exchange Act. *See SEC v. Benger*, 934 F. Supp. 2d 1008, 1013-15 (N.D. Ill. 2013). In *Benger*, the court held that the SEC could not bring a claim for violations of Section 15(a) where the alleged unregistered broker did not work on transactions involving the domestic sale of securities even though the unregistered brokers operated in the United States. *Id.* The parties agree that *Morrison*'s holding applies with equal force in this case, even though this action involves allegations that Quantum acted as an unregistered broker, and not that Quantum perpetrated a securities fraud in violation of Section 10(b).

As such, the threshold issue raised by the cross-Motions is whether the debt issuance and equity transactions involved the sale of securities outside the United States, such that Section 15(a) would not apply to the transactions and Quantum would not need to register as a broker/dealer with the SEC.[3] To determine where a purchase or sale of securities took place, the Eleventh Circuit has looked to see where the transfer of title to securities took place. *Quail*

---

[3] Defendants cite to a 1989 S.E.C. Release addressing foreign broker-dealers, which states that foreign broker-dealers "physically operating within the United States that in effect, induce, or attempt to induce any securities transactions would be required to register as broker-dealers with the Commission." D.E. 190 at 10. This same argument was explicitly rejected in *Benger*, 934 F. Supp. 2d at 1015, because *Morrison* was decided long after the release was issued and is controlling Supreme Court precedent. For similar reasons, this Court also rejects this argument as being unpersuasive and inapposite to this action.

*Cruises Ship Mgmt Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310 (11th Cir. 2011). The Second Circuit has subsumed the Eleventh Circuit's inquiry into its "irrevocable liability" test that asks where the parties became irrevocably bound to take and pay for a security. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). Defendants, as proponents of the defense, have the burden of producing evidence from which the fact finder could conclude that the parties incurred irrevocable liability or transferred title to securities in the United States.

Defendants state that the debt issuance closed in New York, and cite the Senior Unsecured Loan Agreement in support of this statement. D.E. 176 ¶¶ 11, 12. However, the Agreement, on its face, does not concern the purchase or sale of securities. Assuming nonetheless that it anticipated a sale of bonds, Defendants cite to no specific provision within the Agreement that supports their position that the bond transaction was closed in New York.

Additionally, there is no evidence in this Agreement as to where it was executed, where any transfer of title took place, or where Bantrab became irrevocably liable to pay Deutsche Bank. There is reference in the agreement to the state of New York, specifically that the agreement is governed by the law of the State of New York, Bantrab submits itself to the exclusive jurisdiction of the State of New York and of the U.S. District Court for the Southern District of New York, and that Bantrab irrevocably appoints CT Corporation, a corporation located in New York, as its agent to accept service of process. D.E. 160-6 at 39. But these statements do not demonstrate that Bantrab incurred irrevocable liability to Deutsche Bank in New York in connection with the purchase or sale of securities, or that title to any securities was transferred in New York. Further, Defendants' contention is undermined by later clauses in the Agreement that require Bantrab to ensure that the Agreement itself, and each promissory note

24

executed and delivered under the Agreement, is in proper legal form under the laws of Guatemala, and that "such documents shall be duly authenticated, consularized and translated into Spanish by a certified translator in Guatemala." D.E. 160-6 ¶¶ 8.10, 9.06. As such, Defendants have not made a showing sufficient to permit the conclusion that U.S. securities laws apply to the Deutsche Bank transaction. Accordingly, Quantum is entitled to summary judgment against Defendants' on Defendants' first affirmative defense that Quantum's July 25, 2011 contract violated federal securities laws.

As to the capitalization transaction, the undisputed testimony from Bantrab's corporate representatives is that the sale of preferred equity closed in Guatemala. D.E. 182-5 at 144:6-146:17. Further, Quantum submitted a letter Socorro sent to Garcia prior to the DHK transaction closing, which explains that the money for the purchase of preferred stock is being held in a U.S. bank, but that Bantrab will issue a certificate of shares indicating that DHK purchased the shares from Guatemala once the U.S.-held money is converted in quetzals and given to Bantrab. D.E. 183-4. Accordingly, the sale of Bantrab's preferred equity took place in Guatemala, outside the territorial reach of the Exchange Act. Thus, Section 15(a)'s registration requirements do not apply to any broker/dealer working on the transaction.

Defendants point to the fact that payment for the shares occurred between banks in the United States. But, transfer of funds to complete a securities purchase between United States financial institutions does not make a foreign transaction domestic. *See MVP Asset Mgmt (USA) LLC v. Vestbirk*, No. 2:10-cv-02483, 2012 WL 2873371, at *7 (E.D. Cal. July 12, 2012) ("Plaintiff's allegations concerning the transactions, that certain funds were transferred in between New York-based banking institutions, are insufficient to establish the existence of a domestic transaction, as required under Section 10(b)."); *cf. Morrison*, 561 U.S. at 266 ("But the

25

presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case."). Accordingly, Quantum is entitled to entry of summary judgment on Bantrab's first affirmative defense to the extent it is grounded on federal securities law.

    ii.    <u>Florida Securities Laws</u>

Florida has its own statute that requires securities brokers to be registered:

> (1) No dealer, associated person, or issuer of securities shall sell or offer for sale any securities in or from offices in this state, or sell securities to persons in this state from offices outside this state, by mail or otherwise, unless the person has been registered with the office pursuant to the provisions of this section.

Fla. Stat. § 517.12(1). In relevant part, a "dealer" is defined as "[a]ny person, other than an associated person registered under this chapter, who engages, either for all or part of her or his time, directly or indirectly, as broker or principal in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." Fla. Stat. § 517.021(6)(a)1. "'Offer to sell,' 'offer for sale,' or 'offer' means any attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, or an investment or interest in an investment, for value." Fla. Stat. § 517.021(16).

Where a contract calls for an unregistered broker to act in such a capacity in violation of Section 517.12, the contract is "void and confers no enforceable rights on the contracting parties." *Umbel v. Foodtrader.com, Inc.*, 820 So. 2d 372, 374 (Fla. Dist. Ct. App. 2002).

Quantum moves for summary judgment on Defendants' affirmative defense to the extent the defense relies on Florida law because, Quantum contends, Florida securities laws, similar to federal securities laws, are confined to regulating conduct that affects securities transactions occurring within the state of Florida. Quantum relies on *Allen v. Oakbrook Sec. Corp.*, 763 So. 2d 1099 (Fla. Dist. Ct. App. 1999), in support of its argument.

26

*Allen*, however, is inapposite to this action. In *Allen*, the only connection to Florida was that some of the securities "consisted of stock in a company which was incorporated in Florida and had its principal place of business in Florida." *Id.* at 1100-01. It appears, however, that all fraudulent conduct and the sale of securities "occurred entirely in other states." *Id.* at 1100. Therefore, the Florida securities laws did not reach the plaintiffs' securities fraud claims. Unlike in *Allen*, Defendants base their defense under a different section of the Florida securities laws, and this section specifically focuses on whether a dealer sells or makes an offer to sell securities from the state of Florida. Thus, Quantum's argument does not warrant summary judgment against Defendants on their first affirmative defense to the extent it relies on Chapter 517, *et seq.*, of the Florida Statutes.

Defendants move for summary judgment under this statute on Counts IV through VII. Defendants contend that there is no dispute as to the following facts: (1) the equity transaction between Bantrab and DHK involved the purchase of securities; (2) Quantum acted as a dealer under Florida law; (3) Quantum used the mails, means, and instrumentalities of interstate commerce in Florida to induce the DHK transaction.

Quantum disputes that the DHK transaction involved the sale of a security. However, this dispute amounts to a mere denial and is not supported by any evidence in the record. The parties agree that the "DHK transaction was a sale of preferred equity in the form of a stock in Bantrab." D.E. 196 ¶ 74. Under Florida Statute § 517.021(22), "'[s]ecurity' includes any of the following . . . a stock." Further, Jugo testified that "DHK bought a security." D.E. 181-4 at 162:10. As such, there is no issue of fact as to whether the DHK transaction involved the sale of securities.

That being said, there is a question of fact as to whether Jugo was operating as a "dealer" under Florida law. As stated above, Florida defines a "dealer" as "[a]ny person, other than an

associated person registered under this chapter, who engages, either for all or part of her or his time, directly or indirectly, as broker or principal in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." Fla. Stat. § 517.021(6)(a)(1). A person who is a dealer cannot sell, offer for sale, or solicit an offer to buy securities from offices in the state of Florida without first registering as a securities dealer in Florida.

Unlike federal securities law, there is no Florida case setting forth a multi-factor test regarding whether an individual can be considered a "dealer." There is also no clear test as to what activities constitute an unregistered dealer selling, or offering for sale, securities in violation of § 517.12(1). In *Umbel*, the illegal contract called for a partnership to raise investments for purchasing a percentage of a company. 820 So. 2d at 374. The partnership would receive a ten percent commission or fee from any such investment. *Id.* The court found that "[s]uch an endeavor, when carried out by persons who are not registered securities dealers . . . is in contravention of the Act." *Id.* In *Edwards v. Trulis*, 212 So. 2d 893, 895 (Fla. Dist. Ct. App. 1968), the court found that a contract between the owner of registered corporate stocks in Florida and a person who has failed to register as a dealer under Chapter 517, "whereby the seller agrees to pay the salesman a commission for his services in selling corporate stocks owned by the seller, is contrary to public policy of [Florida] and therefore void ab initio." In *Buehler v. LTI Int'l, Inc.*, 762 So. 2d 530, 530 (Fla. Dist. Ct. App. 2000), the court affirmed the trial court's grant of summary judgment under § 517.12 against an individual who brought a breach of contract claim against a closely-held corporation due to the "failure to pay him a finder's fee for obtaining purchasers of LTI stock."

Here, there is a question of fact as to whether Quantum is seeking a broker's fee in violation of § 517.12, or if it is seeking a fee for acting as an advisor and consultant in

completing the equity issuance.[4] Jugo testified that he was contracted to perform a number of duties, including acting as Bantrab's corporate financial advisor to seek institutional investors, advising the bank on how to structure any investment, negotiating on their behalf, and ensuring that the bank qualified with Guatemala's bank superintendency to capitalize. D.E. 181-4 at 162:16-23. He also testified that he would receive a commission from the bank as an advisor. *Id.* at 163:4-7. Moncada testified that Quantum organized documentation for the Guatemalan superintendents, and that Quantum performed a variety of services, including analyzing Bantrab's needs and helping with strategy. D.E. 182-6 at 56:6-57:17. Accordingly, Defendants' Motion on this affirmative defense will be denied and the applicability of §517.12 to the equity transaction will be an issue at trial.

With respect to the applicability of §517.12, the Court notes that Quantum contends in its opposition brief to Defendants' Motion that there are a number of exemptions that would excuse Quantum from the registration requirement of § 517.12. Section 517.12(3) provides that "[e]xcept as otherwise provided in s. 517.061(11)(a)4., (13), (16), (17), or (19), the registration requirements of this section do not apply in a transaction exempted by s. 517.061(1)-(12), (14), and (15)." Thus, this provision means that if a transaction is exempt from the registration of securities requirements of § 517.07 under specific provisions of § 517.061, then the dealer working on the transaction is also exempt from the registration requirements of § 517.12(1).

Quantum argues that two possible exemptions apply to the DHK transaction: § 517.061(7) and § 517.061(8). As a preliminary matter, Quantum is incorrect that Defendants bear the burden of showing that no exemption applies to the DHK transaction. Under Florida

---

[4] There are similar questions of fact as to whether Quantum acted as a financial advisor and consultant for the Deutsche Bank transaction, or whether Quantum acted as a dealer on that transaction.

securities law, Quantum bears the burden of proving that the DHK transaction fell under a statutory exemption that would allow it to operate as an unregistered dealer. Fla. Stat. § 517.171 ("Burden of proof.—It shall not be necessary to negate any of the exemptions provided in this chapter in any complaint, information, indictment, or other writ or proceedings brought under this chapter; and the burden of establishing the right to any exemption shall be upon the party claiming the benefit of such exemption.").

Section 517.061(7) provides an exemption for "[t]he offer or sale of securities to a bank[.]" This exemption does not apply to the DHK transaction, however, because on its face this exemption only applies when a security is sold to a bank, not when shares of a bank are sold to a private investor. As such, Quantum will not be permitted to rely on this exemption at trial.

Section 517.061(8) provides an exemption for "[t]he sale of securities from one corporation to another corporation provided that: (a) the sale price of the securities is $50,000 or more; and (b) the buyer and seller corporations each have assets of $500,000 or more." It is not clear from the record, however, that the DHK transaction involved two corporations, especially because DHK Finance is repeatedly referred to as a "special investment vehicle." Further, Quantum has provided no evidence as to whether DHK has over $500,000 in assets. As such, if Quantum wishes to rely on this exemption at trial, it will have to produce evidence showing that the DHK transaction occurred between two corporations and that each corporation has more than $500,000 in assets.

## II.    Motion for Sanctions

### PROCEDURAL AND FACTUAL BACKGROUND

This action was originally filed in state court on March 13, 2014. D.E. 1-1. Defendants removed this action to federal court on August 29, 2014. D.E. 1. On November 21, 2014, the

Court granted in part Defendants' motion to dismiss, and gave Quantum leave to amend its initial Complaint. D.E. 38. On November 28, 2014, Quantum filed an Amended Complaint, which is the operative pleading in this matter. D.E. 40.

As described above, in the Amended Complaint, Quantum alleges that it entered into an agreement with Defendant Banco de los Trabajadores ("Bantrab") to assist Bantrab in completing a debt issuance. D.E. 40 ¶¶ 16, 18. In exchange for its assistance, Quantum was to receive a success fee of 1.5% of the amount of debt issued. *Id.* ¶ 16. Bantrab completed a debt issuance of $150 million with Deutsche Bank in December 2013. *Id.* ¶ 20. Quantum alleges that it is owed $2.25 million as a result of the debt issuance pursuant to its July 25, 2011 contract with Bantrab. *Id.* ¶ 21.

Quantum also alleges that the individual Defendants, referred to as the "G3," instructed Quantum to assist with a preferred equity transaction that Bantrab needed to finish prior to completing its debt issuance. *Id.* ¶ 33. The G3 verbally affirmed that Quantum would be paid a 5% success fee of the total amount of the preferred equity purchase in exchange for its assistance. *Id.* ¶ 33. As a part of the preferred equity purchase, Quantum alleges that the G3 met in its office on May 14, 2012 to enter into a written agreement titled "*Acuerdo de Entendimiento*" for the purchase of $20 million in Bantrab preferred stock by an investor named DHK Finance. *Id.* ¶ 35. Quantum alleges that during this meeting, Socorro asked Defendant Hernandez if the 5% fee arrangement with Quantum was in place and Hernandez verbally agreed that Bantrab would be responsible for the fees to Quantum. *Id.* ¶ 36. On June 4, 2013, the transfer of stock between Bantrab and DHK Finance was completed. *Id.* ¶ 37. Bantrab has failed, however, to pay the 5% placement fee, which amounts to $1 million, to Quantum. *Id.* ¶ 38.

Quantum served its first requests for production on March 20, 2015. D.E. 138-2. The following requests and responses were the same for each Defendant:

> 21) All documents that evidence meetings attended by BANTRAB, Hernandez, Liu, Garcia, and/or any other BANTRAB's employees, representatives and/or agents, where DHK Finance, Hidalgo Socorro, and/or Braulio Perez [a partner in DHK] were also present.
>
> **RESPONSE:** None.
>
> 26) All documents related to the May 14, 2012, written agreement titled "Acuerdo de Entendimiento" for the purchase of $20,000,000.00 in BANTRAB preferred stock by DHK Finance, including but not limited to draft of the agreement titled "Acuerdo de Entendimiento," including communications evidencing the negotiation, execution, and/or performance of the agreement titled "Acuerdo de Entendimiento".
>
> **RESPONSE:** None.

*Id.* In May 2015, Defendants produced its first batch of documents in response to Quantum's requests. On May 13, 2015, Quantum emailed Defendants objecting to the production for a number of reasons, including that Defendants had failed to put together a list of search terms and custodians. D.E. 138 at 5; D.E. 68 at 3. On June 5, 2015, Quantum filed a motion to compel. D.E. 68. This motion was referred to Magistrate Judge Alicia M. Otazo-Reyes. D.E. 69.

On June 16, 2015, Judge Otazo-Reyes held a hearing on the motion and ordered Defendants to provide a list of custodians whose documents were searched and the search terms that were used by June 22, and to confirm that the personal email accounts of the individual Defendants were searched. D.E. 142 at 33:12-18. Quantum attaches a copy of the letter to the Motion. D.E. 138-3. In the letter, Defendants represent that they searched the computers of Sergio Hernandez, Vinicio Rodriguez, Carlos Enrique Reynoso Poitevin, and Ronald Garcia. *Id.* The letter also represents that the personal email accounts of Sergio Hernandez and Ronald Garcia were searched. *Id.* The letter states that Eduardo Liu's computer crashed on or about

August 2014 and that all the information stored on the computer, which included his email correspondence, was lost. *Id.*

Following the letter, the parties had another hearing in front of Judge Otazo-Reyes on June 26. D.E. 143. At the hearing, Judge Otazo-Reyes stated she would appoint a special master to oversee the parties' electronic discovery. D.E. 143 at 24:12-16. Judge Otazo-Reyes emphasized at both hearings that the discovery issues were in part the result of Quantum failing to propose search terms and custodians, and failing to work with Defendants prior to the May 2015 production to ensure that it received the documents it requested. D.E. 142 at 7:3-8; D.E. 143 at 64:2-25.

On June 29, 2015, Judge Otazo-Reyes appointed Alvin Lindsay as the Special Master. D.E. 83. On August 18, 2015, he issued a Report, requiring Defendants to provide a rolling production of documents to be completed by September 10, 2015. D.E. 111. The report also named the custodians whose accounts were to be searched and what search terms were to be used. D.E. 111-1. The report also instructed Defendants to provide Mr. Liu's computer to the vendor.

To give effect to Mr. Lindsay's report, the Court granted a ninety-day extension of all pretrial deadlines, but advised the parties that no further extensions of any deadline would be granted under any circumstances. D.E. 113. On September 11, 2015, Quantum filed a motion for protective order stating that Defendants had filed a notice of taking videotaped depositions for two non-party fact witnesses despite failing to comply with the deadlines set forth in Mr. Lindsay's report. D.E. 125. As of September 11, 2015, Defendants had not produced any documents despite being ordered to provide a rolling production. The Court granted Quantum's motion for a protective order and barred Defendants from taking further discovery until they

fully complied with the production requirements of E-Discovery Special Master. D.E. 130. In its Order, the Court found that "the Defendants have flagrantly and intentionally failed to comply with the parties' Joint ESI Plan and the Report of the Special Master." *Id.* The Court also required Mr. Lindsay to file a report on September 21, 2015, advising the Court as to whether or not Defendants had fully complied with the production requirements set forth in his initial report.

In his second report, Mr. Lindsay stated that Defendants had fully complied in good faith with the production requirements in his initial report. D.E. 133 ¶ 1. Further, Defendants had produced approximately 10,000 documents, including approximately 12,000 pages in tiff and searchable text format. *Id.* ¶ 2. Also, regarding Mr. Liu's computer, Defendants' vendor represented that its forensic analysis indicated that there was no intentional deletion of data from the drive and that Defendants would provide a forensic copy of the entire drive to Quantum at Quantum's expense. *Id.* ¶ 4.

In reviewing the production, Quantum discovered that Defendants' responses to the Request Nos. 21 and 26 were false. Specifically, Defendants had a number of documents responsive to these requests, including the following:

- A signed copy of the *Acuerdo* that was attached to a September 2013 email from Braulio Perez to Hernandez, Liu, and Garcia. D.E. 138-1.

- A May 2012 email from Oswaldo Jugo attaching a draft of the *Acuerdo* and a spreadsheet. D.E. 138-9.

- An October 2013 email from Hidalgo Socorro to Hernandez, Liu, and Garcia, with a courtesy copy directed to Braulio Perez, attaching a later version of the same spreadsheet that details the conditions for the preferred equity agreement. D.E. 138-10.

- An October 2013 draft email from Garcia to Hernandez that states the parties signed a memorandum of understanding, and that the G3 would like the memorandum of understanding (the *Acuerdo*) be made void. D.E. 138-11.

- A July 2013 email from Braulio Perez to the G3 and Socorro attaching meeting minutes for a meeting that took place on July 8, 2013 in the Fountainebleau Hotel regarding DHK Finance. In the meeting minutes, the individual Defendants are referred to as the "G3." D.E. 138-12.

These documents also demonstrated that the representations in Defendants' June 22 letter were false because the search terms used would have uncovered these documents in possession of Sergio Hernandez and Ronald Garcia if the search terms had been used.

Quantum also used the recently produced documents to highlight testimony from the G3 that, at best, is evasive, and, at worst, false. This includes:

- Each of the G3 testified they could not recall signing the *Acuerdo* or participating in any meeting where the *Acuerdo* was discussed. D.E. 140-16 at 108:21-109:25; D.E. 140-17 at 95:10-96:11, 102:18-103:7, 110:25-112:15; D.E. 140-21 at 32 (114:3-17); 34 (122:9-16).

- Defendants Hernandez and Garcia refused to state that they had signed the *Acuerdo* without seeing the original document despite being confronted with signed copies of the *Acuerdo*. Hernandez also refused to acknowledge that he had ever seen any drafts of the *Acuerdo* despite being confronted with emails he sent editing and discussing the *Acuerdo*. D.E. 140-17 at 96:24-97:13, 102:18-103:7, 108:14-109:2, 112:6-15; D.E. 140-21 at 59:7-10; D.E. 140-21 at 32 (115:16-116:11); 39 (144:3-145:4); 46 (170:7-171:6); 47 (174:1-20); 48 (178:14-181:7); 53 (198:1-9); 54 (205:12-206:14); 55 (208:17-24).

- Defendants Hernandez and Garcia also testified that they did not recall being in front of Plaintiff's office in Miami on May 21, 2012, despite being confronted with a photograph from the meeting. D.E. 140:17 at 110:25-111:24; D.E. 140-21 at 35 (128:5-22); 47 (176:4-20); 53 (199:4-200:19).

- The G3 refused to acknowledge that "G3" referred to the individual Defendants despite being presented with many documents, including documents drafted by Defendants, in which the term was included. D.E. 140-16 at 96:16-98:10; D.E. 140-17 at 94:7-95:9; D.E. 140-21 at 213-215 (102:1-104:6); 36 (130:4-131:22); 51 (190:16-191:23).

- Defendant Hernandez's testimony where he: refused to acknowledge he had any business dealings with Hidalgo Socorro, despite being presented with video of Mr. Socorro in Bantrab's office and business documents exchanged with Mr. Socorro, D.E. 140-21 at 222-223 (111:9-112:13); 225-226 (114:10-115:13); 37 (136:9-139:3); 38 (140:22-141:17); 39 (142:4-9); 41 (152:3-153:17); 213:5-17; stated he is unaware of who owns DHK Finance, D.E. 140-21 at 171 (60:21-25), 222 (111:3-10); 223 (112:13-21); 39 (142:15-143:5); and refused to discuss a

draft shareholder agreement that had been sent from his email address and was arguably drafted in connection with the *Acuerdo*, D.E. 140-21 at 217-220 (106:1-109:4).

Defendants' production and deposition testimony also highlights that Defendants have made misrepresentations in filings with the Court, specifically that "all transactions and dealings with Plaintiff occurred in Guatemala," D.E. 11 at 5, and that the "transactions that are the subject of Plaintiff's Complaint in the matter styled, *Quantum Capital, LLC v. Banco de los Trabajadores, et al.*, Case No.: 1:14-CV-23193-UU, have no connection whatsoever to the State of Florida or the United States." D.E. 31-3; D.E. 31-4; D.E. 31-5; D.E. 31-6. Quantum also contends that there are spoliation concerns regarding Defendant Liu's computer.

Based on this discovery, Quantum moves for an order striking Defendants' Answer and Affirmative Defenses, entering default judgments, and awarding Quantum its fees and costs. Alternatively, Quantum asks for (i) an award of attorneys' fees and costs associated with Plaintiff's motion to compel; (ii) a reallocation of Plaintiff's share of the Special Master's fees to Defendants; (iii) the re-taking of Defendants' depositions in Miami at Defendants' expense; and (iv) additional spoliation discovery.

## **LEGAL STANDARD**

The Court has the inherent power to impose sanctions for bad-faith litigation conduct. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *Sprint Solutions, Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1295 (S.D. Fla. 2015). "Sanctions under the Court's inherent authority may include monetary penalties, adverse inferences, and the striking of claims or defenses." *Sprint Solutions*, 83 F. Supp. 3d at 1295.

To unlock its inherent powers, the Court must first find that a litigant has acted in bad faith. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a

meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.*

### DISCUSSION

After reviewing the documents submitted by both parties, it is clear that Defendants did, in bad faith, frustrate discovery in this case by making false statements in response to Quantum's request for production, making misrepresentations in their June 22 letter regarding the search terms that were used and which custodians' documents were searched, and providing evasive testimony when faced with contradictory evidence.[5] In responding to Plaintiff's Motion, Defendants do not dispute nor explain the following:

- They falsely responded "None" when asked for any documents related to the *Acuerdo*.

- The representations made in the June 22 letter were false because the later-produced documents would have been found if the representations were correct.

- The representation made to the Court in their motion to dismiss that the transactions in this case "have no connection whatsoever to the State of Florida" is false and is contradicted by a number of documents produced by Defendants and testimony from Defendants.

- Hernandez and Garcia provided evasive and unbelievable testimony regarding the *Acuerdo* and the circumstances under which it was entered.

Instead, Defendants hope to distract the Court by arguing that the *Acuerdo* is irrelevant and that Quantum's allegations in their Complaint are incorrect. This argument has no bearing on whether

---

[5] The Court does not agree with Quantum that there are spoliation concerns regarding Defendant Liu's computer. Defendants have submitted a declaration from the head of technical support for Bantrab in which he declares that in late September 2014, soon after the time that Liu's computer allegedly crashed, he received Liu's laptop, confirmed that it did not function, and concluded that the laptop had a malfunctioning motherboard. D.E. 138-5. Plaintiff has been provided with a forensic image of the laptop's hard drive for further analysis, and an eDiscovery consultant concluded that there "is no evidence to suggest any data was intentionally deleted from the [laptop]." D.E. 138-5 at 4. Thus, the Court does not see the basis for Plaintiff's argument that Defendants "falsely represented multiple times in the case that Mr. Liu's work computer had 'crashed.'" D.E. 138 at 17.

or not Defendants acted in bad faith. *See Rothenberg v. Sec. Mgmt. Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984) ("In determining the propriety of a bad faith fee award, the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." (internal quotations omitted)). Defendants' argument does not alter the fact that they made numerous misrepresentations to Quantum and the Court, and that they "flagrantly and intentionally failed to comply with the parties' Joint ESI Plan and the Report of the Special Master." This conduct resulted in the case being significantly delayed and required Quantum to expend money to rectify Defendants' conduct, while also defending itself against Defendants improper attempts to take further discovery while in violation of the Court's orders. It also required the Court to devote considerable energy to ensure that Defendants complied with its deadlines and the Federal Rules of Civil Procedure. Collectively, this conduct supports a finding of bad faith because Defendants knowingly or recklessly delayed and disrupted litigation.

Having found that Defendants acted in bad faith, the Court must now determine the appropriate sanction to impose on Defendants. "In determining the amount of sanction to impose, a court must fashion a sanction that not only punishes the wrongdoer, but also serves as a deterrent." *Barash v. Kates*, 585 F. Supp. 2d 1368, 1372 (S.D. Fla. 2008). "When ordering a sanction of default judgment, the Court should find by clear and convincing evidence that (1) a defendant acted in bad faith, (2) the plaintiff was prejudiced by this conduct, and (3) lesser sanctions would not adequately serve the goals of punishment and deterrence." *Sprint Solutions, Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1295 (S.D. Fla. 2015). "'Ultimate sanction' cases ultimately rest upon the conviction that no lesser sanction will prevent the offending litigant from continuing to lie or distort the truth so pervasively that it prevents the opposing party from fairly presenting his case or defense." *Chemtall, Inc. v. Citi-Chem, Inc.*, 992 F. Supp. 1390, 1409 (S.D.

Ga. 1998) (internal quotations and citations omitted). "Use of the 'ultimate sanction' addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of courts, which otherwise cannot command respect if they cannot maintain a level playing field amongst participants." *Id.* (internal quotations and citations omitted).

Here, the Court finds that the ultimate sanction of default judgment is not warranted. Quantum has not been so prejudiced by Defendants' conduct that it has been prevented from fairly presenting its case. Quantum's case does not depend on the *Acuerdo* and the circumstances under which it was entered. The *Acuerdo* itself does not demonstrate that Bantrab and Quantum entered into a contract where Bantrab agreed to pay Quantum a 5% success fee for acting as a financial advisor during the capitalization. Similarly, whether or not the individual Defendants acknowledge that they refer to themselves as the "G3" is not crucial to any issue in this case. There are no documents that Defendants concealed from production that provide "smoking-gun" support for Quantum's claims. Frankly, Quantum's case has been most undermined by Jugo's deposition testimony and admissions, not Defendants' misconduct. Accordingly, the Court finds that striking Defendants' pleadings and entering default judgment against Defendants is appropriate given the lack of prejudice suffered by Quantum.

Nonetheless, Defendants have caused both Quantum and the Court to expend a number of resources getting Defendants to comply with the Federal Rules of Civil Procedure, the Local Rules, and this Court's Orders. Further, Defendants did make misrepresentations to both Quantum and the Court, and caused this action to be delayed. Accordingly, the Court will refer this matter to Magistrate Judge Otazo-Reyes to determine the correct monetary penalty to impose on Defendants. The penalty should take into account the following: (1) the amount of time and

resources expended by Quantum in connection with its motion to compel; (2) the Special

Master's fees paid by each party; (3) the attorney's fees and costs incurred in connection with the

Motion for Sanctions; and (4) the amount of penalty that will be necessary to deter Defendants

from such future conduct.

<u>CONCLUSION</u>

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED as follows:

(1) Defendants' Motion for Summary Judgment, D.E. 157, is GRANTED IN PART and

DENIED IN PART. It is GRANTED as follows: judgment is hereby entered for

Defendant Bantrab and against Plaintiff Quantum on Counts II, III, and VII of the

Amended Complaint, D.E. 40. The Motion is otherwise DENIED.

(2) Plaintiff's Motion for Partial Summary Judgment, D.E. 160, is GRANTED IN PART

and DENIED IN PART. It is GRANTED as follows: judgment is hereby entered for

Plaintiff Quantum and against Defendants' First Affirmative Defense of illegality to

the extent the affirmative defense alleges that the alleged contracts between Quantum

and Bantrab violated federal securities laws. The Motion is otherwise DENIED.

(3) Plaintiff's Motion for Sanctions, D.E. 138, is GRANTED IN PART and DENIED IN

PART in accordance with this Order. The Motion is referred to United States

Magistrate Judge ALICIA OTAZO-REYES to issue a Report and Recommendation

regarding the monetary sanction that should be imposed on Defendants in accordance

with this Order.

DONE AND ORDERED in Chambers, Miami, Florida, this 22d day of December, 2015.

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record